**FILED**
U.S. DISTRICT COURT
EASTERN DISTRICT ARKANSAS

OCT **1 5** 2019

JAMES W. McCORMACK, CLERK
By: _____
                          DEP CLERK

**IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF ARKANSAS
LITTLE ROCK DIVISION**

| | |
|---|---|
| BRAD REACH, on behalf of | § |
| The UNITED STATES OF AMERICA, | § |
| | § |
| PLAINTIFF/Relator, | § |
| | § |
| V. | § |
| | § |
| ARKANSAS HEART HOSPITAL, LLC | § |
| BRUCE MURPHY, M.D. | § |
| MICHAEL T. NOLEN, M.D. | § |
| C.D. WILLIAMS, M.D. | § |
| MEHMET CILINGIROGLU, M.D. | § |
| JOHN DOE NOS. 1-10 | § |
| | § |
| DEFENDANTS | § |

CIVIL ACTION NO. __4:19-CV-716-JM__

31 U.S.C. §§ 3729-32
JURY TRIAL DEMANDED

**FILED UNDER SEAL**

**DO NOT POST TO PACER**

**DO NOT PUT IN PRESS BOX**

# FALSE CLAIMS ACT COMPLAINT
## "QUI TAM"

**TO THE HONORABLE JUDGE OF SAID COURT:**

The United States of America, by and through qui tam Relator, Brad Reach, brings this action

under 31 U.S.C. §§ 3729-32 (The "False Claims Act") to recover from the Defendants for all damages,

penalties, and other remedies available under the False Claims Act on behalf of the United States and

himself and would show unto the Court the following:

### PARTIES

1. Relator, Brad Reach ("Reach"), is an individual and citizen of the United States of America

residing in Little Rock, Arkansas.

2. Defendant Arkansas Heart Hospital, LLC ("AHH") is a limited liability corporation organized

and existing under the laws of the State of Arkansas with its principal place of business located at 1701

This case assigned to District Judge __Moody__
and to Magistrate Judge __Volpe__

S. Shackleford Road, Little Rock, Arkansas 72211. AHH's registered agent for service of process is Gregory M. Hopkins, 1000 West 2nd Street, Little Rock, Arkansas, 72201.

3. Defendant Bruce Murphy, M.D. ("Murphy") is a citizen and resident of Little Rock, Pulaski County, Arkansas. At all relevant times, Murphy was the manager of AHH.

4. Michael T. Nolen ("Nolen") is a citizen and resident of Little Rock, Pulaski County, Arkansas. At all relevant times, Nolen was a physician who performed surgical procedures at AHH.

5. C.D. Williams ("Williams") is a citizen and resident of Little Rock, Pulaski County, Arkansas. At all relevant times, Williams was a physician who practiced medicine and/or performed surgical procedures at AHH.

6. Mehmet Cilingiroglu ("Mehmet") is a citizen and resident of Little Rock, Pulaski County, Arkansas. At all relevant times, Mehmet was a physician who practiced medicine and/or performed surgical procedures at AHH.

7. John Does 1-10 are medical practitioners who practiced medicine at AHH and/or employees of AHH whose identities are currently unknown.

## JURISDICTION AND VENUE

8. This Court maintains subject matter jurisdiction over this action pursuant to 31 U.S.C. §3732(a) (False Claims Act) and 28 U.S.C. § 1331 (Federal Question).

9. Venue is proper in this Court under 31 U.S.C. § 3732(a) because the Defendants, and each of them, are residents of Pulaski County, Arkansas. AHH maintains its principal place of business in Pulaski County, Arkansas.

10. Reach is the original source of and has direct and independent knowledge of all publicly disclosed information upon which the allegations herein are based. Reach has personally gathered all the documentation substantiating the allegations herein. Additionally, he has voluntarily provided all such information to the Government prior to the filing of this action.

2

## THE LAW

### The Medicare Program

11.     In 1965, Congress enacted Title XVIII of the Social Security Act to pay for certain healthcare costs. 42 U.S.C. §1935, *et seq.* Today, federal dollars pay for Medicare, which was established by Title XIX of the Social Security Act, 42 U.S.C. §§ 1396-1396v. The Centers for Medicare and Medicaid Services ("CMS"), which is part of the Department of Health and Human Services ("HHS"), administers the Medicare Program.

### A.  Enrollment and Certification

12.     Enrolled providers and suppliers of medical services to Medicare recipients are eligible for government reimbursement for covered medical services and must agree to abide by the rules, regulations, policies and procedures governing claims for payment in order to receive such reimbursement.

13.     Before participating in government-funded healthcare programs, AHH, physicians and other such providers are required to certify compliance with Medicare's rules and regulations. Thereafter, each time AHH, physicians or any other such provider submits a claim for payment, it is required to recertify its continued compliance.

14.     When enrolling with Medicare, a provider must sign an initial enrollment application and periodically submit new applications as part of the revalidation process. Certification Statement, Sec. 5, CMS Form 855, Medicare Enrollment Application, Institutional Providers, *available at* https://www.cms.gov/Medicare/CMS-Forms/CMS-Forms/downloads/cms855a.pdf. As part of its agreement with Medicare, a provider certifies the following:

> I understand that payment of a claim by Medicare is conditioned upon the claim and the underlying transaction complying with such laws, regulations and program instructions....and on the provider's compliance with all applicable conditions of participation in Medicare.

*  *  *

3

> I will not knowingly present or cause to be presented a false or fraudulent
> Claim for payment by Medicare, and I will not submit claims with deliberate
> ignorance or reckless disregard of their truth or falsity.

*Id.* (emphasis supplied)

15.    After its initial certification, a provider has an ongoing duty to notify Medicare if

anything on the form becomes untrue or inaccurate:

> If I become aware that any information in this application is not true,
> correct, or complete, I agree to notify the Medicare fee-for-service
> contractor of this fact in accordance with the time frames established
> in 42 C.F.R. § 424.516(e).

> * * *

> I agree to notify the Medicare contractor of any future changes to the
> information contained in this application in accordance with the time
> frames established in 42 C.F.R. § 424.516(e).

*Id.*

16.    In addition to the initial and ongoing certifications, each time a provider submits a claim,

electronically or otherwise, the submission must state, in bold type, immediately preceding the

claimant's signature:

> **(1) "This is to certify that the foregoing information is true, accurate, and complete."**

> **(2) "I understand that payment of this claim will be from Federal and State funds, and that
> any falsification, or concealment of a material fact, may be prosecuted under Federal and
> State laws."**

42 C.F.R. § 455.18(a) (emphasis supplied). Medicare Claims Processing Manual, CH. 24 § 30.2 A, available

at http://www.cms.gove/Regualtions-and-Guidance/Guidance/Manuals/downloads/clm104c24.pdf.

17.    For each individual claim for payment, AHH and other such healthcare providers must

submit a CMS Form 1450, which reflects the name of the patient, the type of service provided, the total

charges and the date of the service. CMS Form 1450 requires the provider to certify its understanding

"that misrepresentations or falsifications or essential information. . . requested by [the form] may serve

as the basis for civil monetary penalties and assessments and may upon conviction include fines and/or

4

imprisonment under federal and/or state law(s)" and that the provider "did not knowingly or recklessly disregard or conceal material facts." UB-40 Uniform Bill, CMS Form 1450 (03/01/2007), *available at* https://www.cms.gov/Regulations-and-Guidance/Guidance/Transmittals/Downloads/R1104CP.pdf.

18.    For each individual claim for payment, Williams, Nolen and Mehmet and other such physicians must submit a CMS Form 1500, which reflects the name of the patient, the type of service provided, the total charges and the date of service. CMS Form 1500 requires the physician to certify his or her understanding that "anyone who knowingly files a statement of claim containing any misrepresentation or any false, incomplete, or misleading information may be guilty of a criminal act punishable under law and may be subject to civil penalties". Further the physician certifies that "the services listed were medically indicated and necessary to the health of this patient and were personally furnished by me or my employee under my personal direction. CMS Form 1500 (02/12), *available at* https://www.cms.gov/Medicare/CMS-Forms/CMS-Forms/Downloads/CMS1500.pdf.

### B.    Structural Heart Procedures

19.    Transcatheter Mitral Valve Repair ("TMVR") is a catheter-based technology that delivers and positions a bioprosthetic clip into the mitral valve while the heart is still beating. TMVR eliminates the need for open-heart surgery and makes the use of a heart-lung machine unnecessary. The procedure is designed to relieve symptoms of mitral valve regurgitation and prevent hospitalization for heart failure. TMVR procedures were first approved for Medicare coverage pursuant to a Decision Memo issued by CMS on August 7, 2014. Decision Memo for Transcatheter Mitral Valve Repair (TMVR) (CAG-00438N), *available at*, https://www.cms.gov/medicare-coverage-database/details/nca-decision-memo.aspx?NCAId=273. All of the bioprosthetic clips utilized by AHH for TMVR procedures were manufactured by Abbott Laboratories and were marketed and sold under the trade name Mitraclip.

20.    Transcatheter Aortic Valve Replacements ("TAVR") is a catheter-based technology that delivers and positions a fully expandable, bioprosthetic replacement aortic valve while the heart is still

5

beating. TAVR eliminates the need for a long incision in the chest wall, makes the use of a heart-lung

bypass machine unnecessary, and provides a shorter, more comfortable recovery period when

compared to a surgical aortic valve replacement. TAVR procedures were first approved for Medicare

coverage pursuant to a Decision Memo issued by CMS on May 1, 2012. Decision Memo for

Transcatheter Aortic Valve Replacement (TAVR) (CAG-00430N), *available at*

https://www.cms.gov/medicare-coverage-database/details/nca-decision-memo.aspx?NCAId=257.

      21.  Medicare utilizes an inpatient prospective payment system ("IPPS") that defines how

hospitals are paid by Medicare. The IPPS contains over eight hundred (800) diagnosis related groups

("DGR") that set forth the procedures that have been approved by Medicare for payment. Medicare also

has a list of disease states that will increase hospital payments based on whether the primary DRG

diagnosis also carries a complicating or comorbid condition ("CC") or a major complicating or comorbid

condition. ("MCC"). Actual hospital payment will vary depending on adjustment factors including

geographic difference, teaching status and disproportionate share of indigent patients. A general

explanation of the IPPS is available at https://www.cms.gov/Outreach-and-Education/Medicare-

Learning-Network-MLN/MLNProducts/downloads/AcutePaymtSysfctsht.pdf.

      22.  At all relevant times, the DRG for TMVR procedures with MCC was DRG 228 and the

DRG for TMVR procedures without MCC was DRG 229. According to information assembled by Abbott

Laboratories, Medicare data for fiscal year 2017 indicates that 45% of the TMVR procedures were

performed on patients with MCC and 55% of the procedures were performed on patients without MCC.

2019 MitraClip Coding and Payment Guide, *available at*

https://www.cardiovascular.abbott/content/dam/bss/divisionalsites/cv/pdf/guides/AP2940721-US-Rev-

R-MitraClip-Hospital-and-Physician-Coding-Guide-CERTIFIED-2.pdf. In 2018, the national base payment

for TMVR procedures with MCC was $39,751.00 and the national base payment for TMVR procedures

without MCC was $27,620.00. Abbott Laboratories FY2018 Hospital Coding and Payment Guide.

MitraClip Transcatheter Mitral Valve Repair, *available at*

https://www.vascular.abbott/content/dam/bss/divisionalsites/av/docs/reimbursement/AP2940402-US-Rev-L-MitraClip-Hospital-Coding-and-Payment-Guide.pdf.

23.    At all relevant times, the DRG for TAVR procedures with MCC was DRG 226 and the DRG for TAVR procedures without MCC was DRG 267. According to information assembled by Boston Scientific, TAVR procedures performed on patients with MCC pay between $12,000.00 and $18,000.00 more that TAVR procedures performed on patients without MCC. Boston Scientific "TAVR Reimbursement 101", *available at* http://www.bostonscientific.com/en-US/medical-specialties/interventional-cardiology/cvforward/tavr-reimbursement-101.html

## FACTS

24.  On July 16, 2018, Reach was hired as the Chief Financial Officer ("CFO") at AHH with an annual salary of $225,000.00. In addition to his annual salary, Reach also received a performance bonus of 25% making his total annual compensation package $280,000.00.

25.    Reach's duties included oversight of monthly Finance Council meetings at AHH at which specific service lines were reviewed. The purpose of these reviews was to track income and expenditures for the various services provided at AHH. After analyzing each service line, Reach reported to the Executive Team at AHH that consisted of Murphy, Drew Jackson (Chief Operating Officer), Andrea Nelson (Chief Clinical Officer), and Ashley Hixon (Senior Vice President of Cardiovascular Services). The Executive Team would then direct Reach regarding any action that needed to be taken for any particular service line(s).

### THE STRUCTURAL HEART PROGRAM

26.    From approximately 2015 to the present, AHH has provided medical care to patients through its "Structural Heart Program". Within the Structural Heart Program patients receive treatment

7

for diseases of the valves, chambers, walls and pockets of the heart including aortic stenosis, mitral valve regurgitation, ventricular septal defect and left atrial appendage. AHH employs physicians, surgeons, nurses, therapists and administrative staff in the operation of its structural heart program. Additionally, AHH hires physicians and surgeons as independent contractors who provide medical services within the Structural Heart Program.

27.     Many of the procedures performed through AHH's Structural Heart Program are TMVRs and TAVRs. According to Reach, a very high percentage (85%-95%) of the TMVR and TAVR procedures performed at AHH are performed on Medicare patients.

28.     In January of 2019, the Finance Council conducted a review of open-heart surgeries and the structural heart program. This review covered fiscal years 2017, 2018 and the first quarter of 2019. At that time, Reach learned that the structural heart program operated at a loss of approximately $1,000,000.00 in 2018 and based on the numbers for the first quarter of 2019 was on pace to lose approximately $2,500,000.00 in fiscal year 2019. The reason for these losses was primarily due to a significant decrease in the number of procedures performed on patients with MCC. This information was provided to the Executive Team after which Reach was instructed to schedule a meeting with physicians practicing in the structural heart program in order to advise the physicians that AHH would significantly limit the number of procedures performed if there was not an immediate turnaround.

29.     The meeting occurred in mid-February of 2019. In attendance were Reach, Drew Jackson, Andrea Nelson, Mehmet, Dr. David Michael Mego, and Dr. William Rollefson and others that Reach cannot recall. During the meeting it was reported that 70% of both TMVR and TAVR procedures were presently being performed on patients without MCC. These numbers represented a significant deviation from the national averages as well as a significant decline in the number of procedures performed on patients with MCC at AHH for fiscal years 2017. In fiscal year 2018, these numbers were trending downward.

8

30.     Mehmet, Dr. Mego and Dr. Rollefson responded to this information by stating that they believed a reduction in the number of TMVR and TAVR procedures would place their patients' lives at risk at which point Drew Jackson stated that AHH would continue to monitor these procedures over the next several months to see if there was any change in the financial performance. Reach's role was to work on expense reductions through contract negotiations with vendors and the doctors were to focus on documentation and improving the DRG ratio. Following this meeting, Reach met with Mehmet, Dr. Mego and Dr. Rollefson every Monday at 4:45 p.m.

31.     Almost immediately following the February 2019 meeting, the DRG ratios shifted dramatically. The ratio for TAVR procedures fell in line with the national average (55% with MCC and 45% without MCC) while TMVR procedures went to 93% with MCC and 7% without MCC. During this same time frame, Mehmet had several discussions with Stacie Clyburn, the structural heart account manager with Abbott Laboratories, regarding what documentation was necessary to trigger the higher reimbursement rate. Because of the increase in the number of procedures performed on patients with MCC, the financial fortunes of AHH's structural heart program made a dramatic turnaround.

32.     On May 16, 2019 at the request of Mr. Reach, one of Reach's attorneys contacted Individual 1. Individual 1 is a former employee in the Structural Heart Program at AHH. Individual 1 told Reach's attorney that beginning in February of 2019 the Advance Practice Nurses ("APNs") were being told by physicians to note co-morbidities on patient charts that the patients did not actually have. Specifically, Individual 1 said that APNs were being told to document systolic heart failure for patients who did not have systolic heart failure. The APNs were uncomfortable doing this and were therefore reluctant to chart in their own names.

33.     However, documenting co-morbidities was not enough to trigger the enhanced Medicare reimbursement. Instead the enhanced reimbursement was triggered by documentation of a MCC in the chart in conjunction with actual treatment for the MCC. The treatment could not be the

valve procedure itself. According to Individual 1, physicians at AHH were also ordering treatment for patients that was medically unnecessary. For instance, when a patient without a MCC was documented as having systolic heart failure, that patient was treated with IV Lasix even though they didn't need it. According to Individual 1, Mehmet was the physician at AHH who most frequently ordered the APNs to document MCCs that did not exist and ordered the most unnecessary treatment.

34.     Reach estimates that in a given year, approximately 100 TMVR and 100 TAVR procedures were performed at AHH. Based upon the shift that followed the February 2019 meeting (30% with MCC  to 90% with MCC for TMVR and 30% with MCC to 55% with MCC for TAVR) Reach estimates that for fiscal year 2019 the United States government has been fraudulently billed for approximately $850,000 in services.

## NOLEN/WILLIAMS "FIRST ASSIST" BILLING

35.     In late 2018, Mr. John Cox, Reach's step-father, began to experience symptoms that he suspected were related to heart disease. Mr. Cox lives in Goreville, IL, but was having difficulty getting an appointment with a physician to diagnose and treat him. Mr. Cox contacted Reach about this and Reach was able to arrange for Mr. Cox to be treated at AHH.

36.     Testing at AHH revealed that Mr. Cox had severe multivessel coronary disease and needed bypass surgery. The surgery was performed on January 12, 2019 by Defendant Nolen. Listed on the operative report as "ASSISTANT" is Defendant Williams.

37.     When Mr. Cox was billed for services related to his medical procedures, he asked Reach to go over the bills for him. At that time, Reach noticed that Mr. Cox had received a bill from Williams. Since Reach was there when Mr. Cox was operated on, Reach knew that Williams did not participate in the surgery. Reach began to ask questions of various AHH employees about this and he learned that Nolen and Williams routinely sign on to each other's surgeries as "First Assist" even though they are not actually participating in the surgery or otherwise providing medical services for the patient. Reach was

able to confirm that this was the case through Ashley Hixon who was Vice-President of Ambulatory

Services at AHH. When questioned about this practice by Reach, Mrs. Hixon stated, "They kind of do

that for each other." After learning of this fraudulent billing scheme, Reach spoke to Andrea Nelson, the

Chief Clinical Officer, and told her that this practice was illegal and could put AHH's CMS license in

jeopardy. He also told Nelson that he wasn't willing to go to jail over this practice and that she needed

to notify Murphy.

38.     The actions of Williams and Nolen weren't limited to the medical services provided to

Mr. Cox.  Individual 2 is a former employee of AHH with direct knowledge of the operating room

procedures at the hospital. According to Individual 2, the cardiothoracic surgeons at Arkansas Heart

Hospital also had a similar practice as previously described for all thoracic procedures to include

Coronary Artery Bypass Grafting Surgeries also known as (CABG).  Specifically, Individual 2 personally

witnessed the cardiothoracic surgeons at Arkansas Heart Hospital who were acting as "First Assist's"

enter the operating room while in a gown, simply look down at the patient, and then walk out of the

operating room.  This was standard during Individual 2's time of employment with Arkansas Heart

Hospital for open heart procedures.  The patients were then billed for a "First Assist."

39.     Upon learning that Reach had been making inquiries about the billing practices of Nolen

and Williams, a meeting was held. At this meeting, it was suggested that if either Nolen or Williams was

serving as "First Assist" in a procedure, it may be good enough for that physician to simply robe up, walk

in the operating room, and walk out. Ultimately it was decided that this would not be good enough and

that a physician serving and billing in the capacity of "First Assist" would need to be present in the

operating room throughout the entire procedure.

40.     Based upon the sequence of events leading up to his termination Reach believes that ,

during the week of March 18, 2019, Defendant Murphy and Andrea Nelson, Chief Clinical Officer at AHH,

met while on vacation and discussed the concerns raised by Reach. When Reach went to work at AHH

on March 26, 2019, he was summoned into the office of Defendant Murphy. At that time, Murphy advised Reach that he was not making fast enough progress on certain "action" items assigned by Murphy, did not fit in with the "culture" at AHH and that he would be terminated. This action was taken in spite of the fact that prior to Reach inquiring about the questionable billing practices at AHH, he had received favorable evaluations from Murphy. In fact, during his tenure at AHH, Reach instituted various cost-saving measures for AHH which Reach estimates saved AHH $1,500.000.00.

41.    According to Reach, Williams billed Mr. Cox $6,300.00 for his "First Assist" services, $6,100.00 of which was paid by Mr. Cox's insurance. Reach estimates that Williams and Nolen perform approximately 500 open heart procedures a year and that approximately one-half of those (250) were fraudulently billed in the manner described above. Reach also estimates that approximately 90% of these procedures were billed to Medicare. Accordingly, Reach estimates that over the last ten (10) years, Williams and/or Nolen have fraudulently billed Medicare for $13,500,000.00 (250 x 90% x 10 x $6,000.00).

## CLAIMS

42.    As the Chief Financial Officer of AHH, Relator Reach discovered the above-mentioned and following systemic patterns of fraudulent schemes utilized by AHH and the named defendants herein, which were undetected by Medicare and resulted in overpayments totaling millions of dollars:

(a)    AHH billed Medicare for TMVR and TAVR procedures using the MCC codes when those patients did not actually have the complicating or comorbid conditions;

(b)    In order to trigger the enhanced payments, AHH, Mehmet and others ordered treatment for patients that was not medically indicated or necessary;

(c)    Defendants Nolen, Williams, AHH and others billed Medicare for services which were not provided—to wit, billed as "First Assist" for surgeries in which they did not participate;

12

(d)    AHH was fully aware of the fraudulent billing practices of Nolen and Williams, and AHH also billed for services that were not provided.

## COUNT I

### FALSE CLAIMS ACT VIOLACTIONS
**Fraudulent Documentation of MCCs for TMVR and TAVR Procedures under Medicare Part A**

43.    The allegations set forth in the preceding paragraphs of this Complaint are realleged as if fully set forth herein.

44.    AHH expressly and impliedly certified to Medicare that the treatment upon which its claims for payment were based was reasonable, medically necessary and in compliance with legal and healthcare regulations, when in fact AHH knew or should have known that that its claims for payment included fraudulent charges for TMVR and TAVR procedures.

45.    AHH, Mehmet and others knowingly falsified patient charts and documented complicating or comorbid conditions that did not exist for the purpose of receiving enhanced payments from Medicare for TMVR and TAVR procedures.

46.    AHH, Mehmet and others knowingly provided treatment to patients for complicating or comorbid conditions that did not exist for the purpose of receiving enhanced payments from Medicare for TMVR and TAVT procedures.

47.    As a result of the schemes, acts and failures described in this Complaint, AHH, Mehmet and/or their agents violated, and may continue to violate, 31 U.S.C. § 3729(a)(1)(A) by knowingly, with deliberate ignorance, or with reckless disregard, as those terms are defined in the False Claims Act 31 U.S.C. § 3729, and related case law, "present[ing], or caus[ing] to be presented, a false or fraudulent claim for payment or approval."

48.    By certifying compliance, requesting payment and retaining overpayments, AHH, Mehmet and/or their agents violated, and may continue to violate, 31 US.C. § 3729(a)(1)(A), by

13

knowingly, with deliberate ignorance, or with reckless disregard, as those terms are defined in the False Claims Act 31 U.S.C. § 3729, and related case law, "present[ing], or caus[ing] to be presented, a false or fraudulent claim for payment or approval."

49.     As a result of the schemes, acts and failures described in this Complaint, AHH, Mehmet and/or their agents violated, and may continue to violate 31 U.S.C. § 3729(a)(1)(B) by knowingly, and with deliberate ignorance, or with reckless disregard, as those terms defined in the False Claims Act 31 U.S.C. § 3729, and related case law, "present[ing], or caus[ing] to be presented, a false or fraudulent claim for payment or approval."

50.     By certifying compliance, requesting payment and retaining overpayments, AHH, Mehmet and/or their agents violated, and may continue to violate, 31 US.C. § 3729(a)(1)(B), by knowingly, with deliberate ignorance, or with reckless disregard, as those terms are defined in the False Claims Act 31 U.S.C. § 3729, and related case law, "present[ing], or caus[ing] to be presented, a false or fraudulent claim for payment or approval."

51.     As a result of the schemes, acts and failures described in this Complaint, AHH, Mehmet and/or their agents violated, and may continue to violate 31 U.S.C. § 3729(a)(1)(D) by possessing or retaining, or controlling overpayments and improper Government reimbursements for healthcare services, which AHH, Mehmet and others knowingly, and with deliberate ignorance, or with reckless disregard, as those terms defined in the False Claims Act 31 U.S.C. § 3729, and related case law, "deliver[ed], or cause[ed} to be delivered, less than all of that money or property" back to the Government.

52.     AHH, Mehmet and/or their agents knew or should have known that they received millions of dollars in overpayments and improper reimbursements for healthcare services  as a result of the schemes, acts and failures described in this Complaint, yet AHH, Mehmet and others failed to repay

or refund those improper payments to the Government and retained the money, continuing to bill Medicare, in violation of 31 U.S.C. § 3729(a)(1)(D).

53.     As a result of the schemes, acts and failures described in this Complaint, AHH, Mehmet and/or their agents violated, and may continue to violate 31 U.S.C. § 3729(a)(1)(G) by knowingly, and with deliberate ignorance, or with reckless disregard, as those terms defined in the False Claims Act 31 U.S.C. § 3729, and related case law:  (1) "mak[ing], us[ing], or caus[ing] to be made or used, a false record or statement material to any obligation to pay…money…to the Government;" and (2) "conceal[ing] or…improperly avoid[ing] or decreas[ing] an obligation to pay…money..to the government. AHH, Mehmet and others were obligated to pay money to the Government as reimbursement for the windfall of improper Medicare payments AHH, Mehmet and others received based upon their fraudulent billing practices including billing for services that were not reasonable or medically necessary.

54.     AHH, Mehmet and/or their agents knew or should have known that they received millions of dollars in overpayments and improper reimbursements for healthcare services as a result of the schemes, acts and failures described in this Complaint, yet AHH, Mehmet and/or their agents failed to repay or refund those improper payments to the Government and retained the money, continuing to bill Medicare in violation of 31 U.S.C. § 3729(a)(1)(G).

55.     As a result of the schemes, acts and failures described in this Complaint, AHH, Mehmet and/or their agents violated, and may continue to violate 31 U.S.C. § 3729(a)(1)(C) by "conspir[ing]  to commit a violation of [31 U.S.C. § 3729(a)(1),] subparagraphs (A), (B), (D) or (G)".

56.     The government would not have paid the false and/or fraudulent claims presented by AHH, Mehmet and others absent reliance upon the certifications (1) that it had complied with all applicable conditions of participation in and  payment by Medicare and (2) that the information submitted to Medicare for payment was true, accurate and complete. AHH's and Mehmet's certifications were material to the Government's decision to pay the claims presented by AHH and

Mehmet and to not seek reimbursement. Unaware of these schemes, acts and failures described in this

Complaint and that AHH's and Mehmet's claims for reimbursement were false and/or fraudulent, the

Government was damaged by paying false claims presented by AHH and Mehmet and by failing to

receive reimbursements from AHH and/or Mehmet for those overpayments.

57.     As a result of AHH's and Mehmet's presentment of false and/or fraudulent claims and

unlawful actions, Medicare paid AHH and/or Mehmet millions of dollars that should not have been paid

and AHH and/or Mehmet retained millions of dollars that should have been reimbursed to Medicare.

**COUNT II**
**Billing for Services Not Performed by Nolen and Williams**

58.     The allegations set forth in the preceding paragraphs of this Complaint are realleged as

if fully set forth herein.

59.     AHH, Nolen and Williams expressly and impliedly certified to Medicare that the

treatment, upon which its claims for payment were based, was medically necessary, and in compliance

with legal and healthcare regulations, when in fact Nolen and Williams knew or should have known that

their claims for payment included services that were not actually performed.

60.     As a result of the schemes, acts, and failures described in this Complaint, which resulted

in Nolen, AHH and/or Williams billing for services that were neither reasonable necessary nor actually

performed, AHH, Nolen and/or Williams knowingly—with actual knowledge of the information—

presented or caused to be presented to Medicare false or fraudulent claims for reimbursement.

61.     As a result of the schemes, acts and failures described in this Complaint, AHH, Nolen,

Williams and/or their agents violated, and may continue to violate, 31 U.S.C. § 3729(a)(1)(A) by

knowingly, with deliberate ignorance, or with reckless disregard, as those terms are defined in the False

Claims Act 31 U.S.C. § 3729, and related case law, "present[ing], or caus[ing] to be presented, a false or

fraudulent claim for payment or approval."

16

62.    By certifying compliance, requesting payment and retaining overpayments, AHH, Nolen, Williams and/or their agents violated, and may continue to violate, 31 US.C. § 3729(a)(1)(A), by knowingly, with deliberate ignorance, or with reckless disregard, as those terms are defined in the False Claims Act 31 U.S.C. § 3729, and related case law, "present[ing], or caus[ing] to be presented, a false or fraudulent claim for payment or approval."

63.    As a result of the schemes, acts and failures described in this Complaint, AHH, Nolen, Williams and/or their agents violated, and may continue to violate 31 U.S.C. § 3729(a)(1)(B) by knowingly, and with deliberate ignorance, or with reckless disregard, as those terms defined in the False Claims Act 31 U.S.C. § 3729, and related case law, "present[ing], or caus[ing] to be presented, a false or fraudulent claim for payment or approval."

64.    By certifying compliance, requesting payment and retaining overpayments, AHH, Nolen, Williams and/or their agents violated, and may continue to violate, 31 US.C. § 3729(a)(1)(B), by knowingly, with deliberate ignorance, or with reckless disregard, as those terms are defined in the False Claims Act 31 U.S.C. § 3729, and related case law, "present[ing], or caus[ing] to be presented, a false or fraudulent claim for payment or approval."

65.    As a result of the schemes, acts and failures described in this Complaint, AHH, Nolen, Williams and/or their agents violated, and may continue to violate 31 U.S.C. § 3729(a)(1)(D) by possessing or retaining, or controlling overpayments and improper Government reimbursements for healthcare services, which AHH, Nolen, Williams and others knowingly, and with deliberate ignorance, or with reckless disregard, as those terms defined in the False Claims Act 31 U.S.C. § 3729, and related case law, "deliver[ed], or cause[ed} to be delivered, less than all of that money or property" back to the Government.

66.    AHH, Nolen, Williams and/or their agents knew or should have known that they received thousands of dollars in overpayments and improper reimbursements for healthcare services  as

a result of the schemes, acts and failures described in this Complaint, yet AHH, Nolen, Williams and others failed to repay or refund those improper payments to the Government and retained the money, continuing to bill Medicare, in violation of 31 U.S.C. § 3729(a)(1)(D).

67.    As a result of the schemes, acts and failures described in this Complaint, AHH, Nolen, Williams and/or their agents violated, and may continue to violate 31 U.S.C. § 3729(a)(1)(G) by knowingly, and with deliberate ignorance, or with reckless disregard, as those terms defined in the False Claims Act 31 U.S.C. § 3729, and related case law: (1) "mak[ing], us[ing], or caus[ing] to be made or used, a false record or statement material to any obligation to pay...money...to the Government;" and (2) "conceal[ing] or...improperly avoid[ing] or decreas[ing] an obligation to pay...money..to the government. AHH, Nolen, Williams and others were obligated to pay money to the Government as reimbursement for the windfall of improper Medicare payments AHH, Mehmet and others received based upon their fraudulent billing practices including billing for services that were not reasonable or medically necessary and that were not performed.

68.    AHH, Nolen, Williams and/or their agents knew or should have known that they received thousands of dollars in overpayments and improper reimbursements for healthcare services as a result of the schemes, acts and failures described in this Complaint, yet AHH, Nolen, Williams and/or their agents failed to repay or refund those improper payments to the Government and retained the money, continuing to bill Medicare in violation of 31 U.S.C. § 3729(a)(1)(G).

69.    As a result of the schemes, acts and failures described in this Complaint, AHH, Nolen, Williams and/or their agents violated, and may continue to violate 31 U.S.C. § 3729(a)(1)(C) by "conspir[ing]  to commit a violation of [31 U.S.C. § 3729(a)(1),] subparagraphs (A), (B), (D) or (G)".

70.    The government would not have paid the false and/or fraudulent claims presented by AHH, Nolen, Williams and others absent reliance upon the certifications (1) that they had complied with all applicable conditions of participation in and  payment by Medicare and (2) that the information

18

submitted to Medicare for payment was true, accurate and complete. The certifications by AHH, Nolen, and Williams were material to the Government's decision to pay the claims presented by AHH, Nolen and Williams and to not seek reimbursement. Unaware of these schemes, acts and failures described in this Complaint and that the claims for reimbursement presented by AHH, Nolen and Williams were false and/or fraudulent, the Government was damaged by paying false claims presented by AHH, Nolen and Williams and by failing to receive reimbursements from AHH, Nolen and Williams for those overpayments.

71.      As a result of the presentment of false and/or fraudulent claims and unlawful actions by AHH, Nolen and Williams, Medicare paid AHH, Nolen and/or Williams thousands of dollars that should not have been paid and AHH, Nolen and/or Williams retained thousands of dollars that should have been reimbursed to Medicare.

## COUNT III
### Retaliation and Wrongful Discharge Claim

72.      The allegations set forth in the preceding paragraphs of this Complaint are realleged as if fully set forth herein.

73.      After bringing the above violations of the law to the attention AHH, Relator Reach was discharged from his position as Chief Financial Officer at AHH. Reach's discharge was in retaliation for his efforts to stop one or more violations of the False Claims Act. Such retaliation violates the provisions of the False Claims Act including, but not limited to, 31 U.S.C. § 3730(h). Accordingly, and pursuant to applicable law, Reach is entitled to damages, including but not limited to, double back pay, front pay and compensatory damages.

## PRAYER

WHEREFORE, Plaintiff respectfully prays and demands the following:

(a) That process issue and service be made upon Defendants to appear and answer this Complaint as provided by law;

(b) That judgement be entered in favor of Plaintiff and against Defendants on all counts of the Complaint;

(c) That Plaintiff be awarded all damages flowing from Defendants' wrongful acts;

(d) That Plaintiff be awarded three (3) times the amount of damages sustained by the United States pursuant to 31 U.S.C § 3729, *et seq.;*

(e) That Plaintiff be awarded a civil penalty for each wrongful act by Defendants, pursuant to 31 U.S.C. § 3729, *et seq.;*

(f) That Relator Reach be awarded a portion of all damages, pursuant to 31 U.S.C. § 3729, *et seq.*;

(g) That Relator Reach be awarded expenses, attorney fees and costs pursuant to 31 U.S.C. § 3729, *et seq.*;

(h) That Relator Reach be awarded double back pay, front pay, and compensatory damages for his wrongful termination and the retaliation of the Defendants, pursuant to 31 U.S.C. § 3730(h);

(i) That Plaintiff be awarded any and all other relief as is justified by the facts and which this Court deems just and proper; and

(j) Plaintiff demands a trial by jury.

By: _____

Russell B. Winburn, ABA# 87193
Alan L. Lane, ABA# 03131
Matthew L. Lindsay, ABA #04028
ODOM LAW FIRM, P.A.
161 W Van Asche Loop, Suite #1
Fayetteville, AR 72703
(479) 442-7575
(479) 442-9008 *fax*
rwinburn@odomfirm.com
alane@odomfirm.com
mlindsay@odomfirm.com

*Counsel For Plaintiff/Relator*