IN THE UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF ARKANSAS
CENTRAL DIVISION

BRAD REACH, on behalf of
The UNITED STATES OF AMERICA,                                    PLAINTIFF

VS.                              CASE NO. 4:19-CV-716 JM

ARKANSAS HEART HOSPITAL, LLC
BRUCE MURPHY, M.D.
MICHAEL T. NOLEN, M.D.
C.D. WILLIAMS, M.D.
MEHMET CILINGIROGLU, M.D.
JOHN DOE NOS. 1-10                                               DEFENDANTS

## ORDER

Pending are the motions to dismiss filed by Defendant Mehmet Cilingiroglu, M.D. (ECF No. 60), Defendants Arkansas Heart Hospital LLC ("AHH"), Bruce Murphy, M.D., and Michael T. Nolen, M.D. (ECF No. 64), and C.D. Williams, M.D. (ECF No. 66). In addition, all defendants have filed a motion to strike paragraphs 49, 51-53, and 62 of the First Amended Complaint (ECF No. 62)[1].

I. Standard for Rule 12(b)(6)

To survive a motion to dismiss under Rule 12(b)(6), "a complaint must contain sufficient factual matter, accepted as true, to 'state a claim to relief that is plausible on its face.'" *Ashcroft v. Iqbal*, 556 U.S.622, 678, 129 S.Ct. 1937, 1949, 173 L.Ed.2d 868 (2009) (quoting *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 570, 127 S.Ct. 1955, 167 L.Ed.2d 929 (2007)). The plausibility standard requires a plaintiff to show at the pleading stage that success on the merits is more than a "sheer possibility." *Id.* "[T]he complaint must contain facts which state a claim as a matter of

---

[1] For purposes of this Order, the First Amended Complaint will be referred to as the Complaint.

law and must not be conclusory." *Briehl v. General Motors Corp.*, 172 F.3d 623, 627 (8th Cir. 1999). "When ruling on a motion to dismiss, the district court must accept the allegations contained in the complaint as true and all reasonable inferences from the complaint must be drawn in favor of the nonmoving party." *Young v. City of St. Charles*, 244 F.3d 623, 627 (8th Cir. 2001). The issue at the motion to dismiss stage "is not whether a plaintiff will ultimately prevail but whether the claimant is entitled to offer evidence to support the claims." *Swierkiewicz v. Sorema N. A.*, 534 U.S. 506, 511 (2002).

II. Analysis

Defendants make the same general arguments in each of the motions to dismiss: Plaintiff fails to state a plausible claim for relief, fails to plead fraud with particularity, fails to plead scienter, and fails to allege materiality.

In Count I, Plaintiff claims that AHH and Mehmet knowingly falsified patient charts and documented comorbid conditions that did not exist for the purpose of receiving higher payments from Medicare for valve repair and replacement surgeries. Plaintiff alleges that AHH and Mehmet violated 31 U.S.C. § 3729(a)(1)(A). "A prima facie case under § 3729(a)(l)(A) requires that "(1) the defendant made a claim against the United States; (2) the claim was false or fraudulent; and (3) the defendant knew the claim was false or fraudulent.'" *Olson v. Fairview Health Servs. of Minnesota*, 831 F.3d 1063, 1070 (8th Cir. 2016) (quoting *United States v. Basin Elec. Power Coop.*, 248 F.3d 781, 803 (8th Cir. 2001)). "The FCA attaches liability, not to the underlying fraudulent activity, but to the claim for payment." *Id.* (quoting *Costner v. URS Consultants, Inc.*, 153 F.3d 667, 677 (8th Cir. 1998)). "Without sufficient allegations of materially false claims, an FCA complaint fails to state a claim on which relief may be granted." *U.S. ex rel. Vigil v. Nelnet, Inc.*, 639 F.3d 791, 796 (8th Cir. 2011). "Because the FCA is an anti-

fraud statute, the Complaint's false-claim allegations must comply with Rule 9(b)— 'a party must state with particularity the circumstances constituting fraud.'" *Id.* (quoting *United States ex rel. Joshi v. St. Luke's Hosp., Inc.*, 441 F.3d 552, 556 (8th Cir. 2006)).

  Plaintiff alleges that in January 2019 the Finance Council of AHH conducted a financial review of its Structural Heart Program for the fiscal years 2017 and 2018. Physicians, surgeons, nurses, and therapists in the Structural Heart Program treat patients for diseases of the heart including heart valve repair and replacement surgeries. As a result of the financial review, Plaintiff learned that the Structural Heart Program operated at a loss of approximately one million dollars and was on pace to lose more in fiscal year 2019. He held a meeting with physicians in the Structural Heart Program to inform them of the Program's increasing financial losses. Physicians such as Defendant Mehmet and members of the AHH Executive Team Drew Jackson and Andrea Nelson among others, attended the meeting and engaged in a discussion regarding ways to stem the losses.

  Plaintiff met with Mehmet and two other physicians weekly to monitor the situation. Plaintiff contends that on several occasions Mehmet met with a vendor account manager to discuss potential solutions. The vendor manager instructed Mehmet that documenting extensive comorbidities in patients' charts would permit AHH to bill Medicare at a higher rate, even if the patient did not present with the comorbidities.

  Plaintiff alleges that in February Mehmet began instructing nurses to note non-existent comorbidities in patients' charts and to classify the patients as having MCCs when they did not. The false diagnosis of MCCs facilitated the plan to bill Medicare at a higher reimbursement rate for those patients. According to a former employee (Individual 1) of the Structural Heart Program, physicians in her department ordered treatment for patients that was medically

unnecessary to corroborate the false diagnosis of MCCs. Mehmet was specifically identified by Individual 1 as the physician who primarily perpetuated the false diagnosis plan. For example, Individual 1 said that APNs were told by Mehmet to document systolic heart failure for patients who did not have systolic heart failure. Plaintiff maintains that numerous examples of this practice from at least February 2019 through December 2019 can be found in Defendants' exclusive custody. Plaintiff further alleges that AHH and Mehmet knew their false diagnosis and documentation was material to Medicare's reimbursement rate and knew their diagnoses of MCCs were included in claims made to Medicare.

Citing *U.S. ex rel. Joshi v. St. Luke's Hosp. Inc.*, Defendants argue that these claims are not plead with sufficient particularity. *Joshi*, 441 F.3d 552 (8th Cir. 2006). Dr. Joshi was an anesthesiologist at Defendant St. Luke's Hospital. In the Complaint, Joshi alleged that the hospital and Dr. Bashiiti fraudulently billed Medicare for anesthesia services which he did not provide. Joshi alleged that Certified Nurse Anesthetists actually performed the services without supervision or direction from Dr. Bashiti. Joshi alleged that each and every invoice for nurse anesthetists' work was fraudulent and that the hospital knowingly submitted false claims to the government. The district court dismissed the claim for failure to plead sufficient facts and would not allow Joshi to amend his complaint to add specific details of the scheme because his new specific allegations were barred by the applicable statute of limitations. The Eighth Circuit affirmed. *Id*.

While it is true that the Eighth Circuit Court of Appeals in *Joshi* stated that the relator must provide some representative examples of the alleged fraudulent allegations, the Court emphasized the lack of sufficient "indicia of reliability" in Joshi's claims. *Id.* at 557. The Court

stated that Joshi had no basis for knowledge concerning the submission of the claims because he was a doctor at the hospital not a member of the billing department. *Id*. at 560.

In contrast, Plaintiff was the Chief Financial Officer at AHH. He had access to billing and was involved with AHH's finances on a daily basis. He was privy to the discussions about how to increase profits and had first-hand knowledge that profits increased significantly during the time he alleges the upcoding activity occurred. Specifically, Plaintiff alleges that after the January 2019 meeting regarding the Structural Heart Program's financial losses, the percent of patients with documented MCCs went from 30% to 90% for valve repair surgeries and 30% to 55% for valve replacement surgeries.

As the Eighth Circuit explained more recently, "we find persuasive the approach of those circuits that have concluded that a relator can satisfy Rule 9(b) by alleging particular details of a scheme to submit false claims paired with reliable indicia that lead to a strong inference that claims were actually submitted." *U.S. ex rel. Thayer v. Planned Parenthood of the Heartland*, 765 F.3d 914, 917 (8th Cir. 2014) (internal citation omitted) citing with approval *United States ex rel. Duxbury v. Ortho Biotech Prods., L.P*., 579 F.3d 13, 29 (1st Cir.2009) ("a relator could satisfy Rule 9(b) by providing 'factual or statistical evidence to strengthen the inference of fraud beyond possibility' without necessarily providing details as to each false claim.")). "Nothing requires [the plaintiff] to state every factual detail concerning every alleged fraudulent claim submitted . . .." *Joshi,* 441 F.3d at 560. Based upon the allegations and Plaintiff's position, the Court finds that Plaintiff has included sufficient allegations to state a claim under the FCA and to withstand Defendants' motion to dismiss Count 1.

In Count II, Plaintiff alleges that Williams, Nolen, and AHH knowingly presented or caused to be presented bills to Medicare for services as an assistant surgeon, or a "first assist,"

that were not actually performed, in violation of 31 U.S.C. § 3729(a)(1)(A). As a representative example, Plaintiff alleges that Williams submitted a claim to Medicare for his services as a first assist in a coronary bypass surgery on an individual identified in the Complaint as O.O. on January 12, 2019. Plaintiff alleges that Williams did not participate in the surgery and could not have assisted because he was prohibited from participating in any surgical procedure at the time due to a health condition. Williams was listed as the first assist on seven specifically identified bypass surgeries for Medicare patients where Nolen was the primary physician during the time Williams was prohibited from participating in any surgical procedure. Plaintiff alleges that Williams fraudulently billed Medicare approximately $42,000 for acting as a first assist on these seven surgeries.

Plaintiff also alleges that Nolen permitted Williams to fraudulently sign off as a first assist on surgeries in exchange for Williams doing so for Nolen. There is no specific allegation that Nolen fraudulently billed Medicare for his services as an assistant surgeon, only that he knowingly participated in the scheme with Williams and AHH. Plaintiff alleges that this alleged "trade-off" between Nolen and Williams was confirmed to him by Ashley Hixon who was the Vice President of Ambulatory Services at the time. Medicare would not have paid these claims from AHH, Williams, and Nolen absent reliance upon these presentments. Accepting all the allegations contained in the Complaint as true and drawing all reasonable inferences in favor of Plaintiff, the Court finds that Plaintiff has stated a claim against AHH, Williams, and Nolen for violation of 31 U.S.C. § 3729(a)(1)(A) in Count II.

In Count III, Plaintiff claims that he was terminated by Defendant Murphy and AHH after he raised the issues of fraudulent billing in violation of the False Claims Act. Plaintiff was hired as the Chief Financial Officer at AHH on July 16, 2018. According to the Complaint,

6

Plaintiff negotiated a vendor contract that saved AHH $325,000 annually, coordinated with physicians and staff to lower costs and improve margins, and met every obligation in a timely fashion. Plaintiff claims that he received only positive performance reviews and met the objective goals assigned to him by Murphy and other supervisors until Plaintiff questioned the billing practices of AHH, Williams, and Nolen. Plaintiff alleges he was called in by administration two times while at AHH, both of which occurred close in time to his complaint about alleged fraudulent billing.

In the first instance, Plaintiff alleges that Murphy and Drew Jackson held a meeting with him about issues with his "performance" within "days to weeks" after Plaintiff raised his fraudulent first assist billing concerns with Richard Skeens, AHH Vice President of Revenue Cycles, and Ashley Hixon. The second time was after Plaintiff learned about and reported Mehmet's upcoding scheme to Andrea Nelson, AHH Chief Clinical Officer. Plaintiff alleges that he told Nelson about his concerns that illegal billing practices could put AHH's Medicare license in jeopardy and that he could be at risk criminally as the CFO. He contends that he told Nelson that he wasn't willing to go to jail over these practices and that she should inform Murphy about these issues. Days later Nelson and Murphy traveled together for spring break, returning to AHH on March 26, 2019. Plaintiff was summoned to Murphy's office on the same day and terminated. Plaintiff alleges that Murphy wrongfully terminated him in retaliation for his efforts to stop violations of the False Claims Act and in violation of 31 U.S.C. § 3730(h).

The FCA whistleblower statute protects employees who are "discharged ... because of lawful acts done by the employee ... in furtherance of [a civil action for false claims]." 31 U.S.C. § 3730(h); *Wilkins v. St. Louis Hous. Auth.*, 314 F.3d 927, 932–33 (8th Cir. 2002). In order to prove retaliation in violation of § 3730(h), a plaintiff must prove that (1) he was engaged in

conduct protected by the FCA; (2) his employer knew that the plaintiff engaged in the protected activity; (3) the employer retaliated against the plaintiff; and (4) the retaliation was motivated solely by the plaintiff's protected activity. *Schuhardt v. Washington Univ.*, 390 F.3d 563, 566 (8th Cir. 2004).

Protected activity is established when the employee's actions satisfy two conditions: (1) the employee's conduct must have been in furtherance of an FCA action; and (2) the employee's conduct must be aimed at matters which are calculated, or reasonably could lead, to a viable FCA action. *Schuhardt,* 390 F.3d at 567. The second condition is satisfied if the employee in good faith believes, and a reasonable employee in the same or similar circumstances might believe, that the employer is possibly committing fraud against the government. *Id.* (quoting *Wilkins v. St. Louis Housing Auth.,* 314 F.3d 927, 933 (8th Cir. 2002)). "The protected activity element of a retaliation claim does not require the plaintiff to have filed an FCA lawsuit or to have developed a winning claim at the time of the alleged retaliation." *Id.* (quoting *United States ex rel. Karvelas v. Melrose-Wakefield Hosp.*, 360 F.3d 220, 236 (1st Cir. 2004)). An internal grievance can serve as the basis for an FCA lawsuit. *Schuhardt*, 390 F.3d at 567. The focus is whether the internal complaint "alleges fraud on the government." *U.S. ex rel. George v. Boston Scientific Corp.*, 864 F.Supp.2d 597, 606 (S.D. Tex. 2012) (quoting *McKenzie v. Bellsouth Telecom. Inc*, 219 F.3d 508, 516 (6th Cir. 2000)). "The employee's actions must be aimed at matters demonstrating a 'distinct possibility' of False Claims Act litigation." *U.S. ex rel. George*, 864 F.Supp.2d at 605 (citing *United States ex rel. Sanchez v. Lymphatx, Inc.*, 596 F.3d 1300, 1303-04 (11th Cir. 2010) (per curiam)).

Plaintiff alleged that he observed, investigated, and identified what he believed to be FCA violations. He told administrators at AHH that he believed the upcoding and first assist

schemes were fraudulent and could result in the loss of a Medicaid license and even jail time. Plaintiff alleged that his employer, Murphy as CEO of AHH, knew that he had taken these actions. Further, he alleged that there was no basis for his termination other than his complaints about the billing practices and he was terminated within a week after confronting Nelson with his concerns. Plaintiff has pled facts to support his allegation that AHH's retaliation was motivated by his protected activity. For these reasons, the Court finds that Plaintiff has stated a claim for retaliation and wrongful termination against AHH. However, "the FCA does not impose individual liability for retaliation claims," so Plaintiff cannot maintain a retaliation claim against Murphy individually. *United States ex rel. Strubbe v. Crawford Cnty. Mem'l Hosp.*, 915 F.3d 1158, 1167 (8th Cir. 2019). Defendants' motion to dismiss Count III is denied as to AHH and granted as to Murphy.

Finally, Defendants ask the Court to strike paragraphs 49, 51-53, and 62 of the Complaint which they state contains information from the Department of Justice's Civil Investigative Demand in this case. The FCA provides that "[t]he Attorney General may delegate the authority to issue civil investigative demands," and "[a]ny information obtained by the Attorney General or a designee of the Attorney General ... may be shared with any qui tam relator if the Attorney General or designee determine it is necessary as part of any false claims act investigation." 31 U.S.C. § 3733(a)(D). There is no evidence that Plaintiff obtained the information in the five paragraphs at issue improperly. The motion to strike is denied.

In conclusion, the motions to dismiss (ECF Nos. 60, 64, 66) are DENIED in part and GRANTED in part and the motion to strike (ECF No. 62) is DENIED. The Clerk is directed to dismiss Defendant Bruce Murphy, M.D as a defendant in the case. The Defendants' motion for leave to file a reply to the Statement of Interest (ECF No. 91) is DENIED.

9

IT IS SO ORDERED this 23rd day of August, 2023.

_____
James M. Moody Jr.
United States District Judge